**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

FRANK DARRELL MARTINEZ,             *

Plaintiff                              *

v.                                *        Civil Action No. JKB-13-864

OFFICER DAVID ROESLER[1]       *
OFFICER ERIC HEYMAN
                                  *

Defendants

                                    ***

**<u>MEMORANDUM</u>**

        In an unverified complaint, plaintiff Frank Darrell Martinez, a Maryland Division of Correction prisoner presently housed at Eastern Correctional Institution, requests compensatory and punitive damages for violation of his Fourth and Fourteenth Amendment rights, stemming from his June 30, 2011, arrest by defendants Baltimore County Police Officers David Roesler and Eric Heyman.  Defendants have filed a motion for summary judgment (ECF No. 17), which is opposed by plaintiff.[2]  ECF No. 21.  A hearing in this matter is unnecessary. *See* Local Rule 105.6 (D. Md. 2014). For the reasons stated below, defendants' motion shall be granted.

**Background**

        In his unverified complaint, Martinez states that defendants found him drunk and asleep on the ground while pursuing three burglary suspects.  Roesler "let his K-9 dog Luke #2982 attack" and "rip up [Martinez's] arm up real bad to where it was bleeding and needed stitches." Martinez further states that Roesler "kicked me in my head so hard that I had patches of hair missing on my head."  Martinez was arrested and "taken to the precin[c]t for 5 hours and denied

---

[1] The Clerk shall amend the docket to reflect the full and proper spelling of defendants' names.

[2] Within his opposition response, plaintiff requests appointment of counsel.  ECF No. 21, p. 2.  For reasons previously articulated in a November 15, 2013 Order (ECF No. 22), the request is denied.

medical attention" by Heyman.  He claims he was taken to the hospital after he "passed-out from the pain."  Martinez claims the denial of immediate medical attention constituted "cruel and unusual punishment" and he is "slightly paralyzed" as a result.  ECF No. 1, p. 4.[3]  He infers that Roesler focused on him as a suspect based on racial profiling, because the suspect was a "light-skinned black person" and that medical treatment was delayed so that he could be subjected to interrogation.  ECF No. 21, p. 1.

Defendants provide a significantly different version of the June 30, 2011, incident.  At approximately 12:10 a.m., Baltimore County police officers were summoned to the Oakleigh Convenience Store in Parkville, Maryland for a burglary that had just occurred.  Heyman was aware that on the previous night a burglary occurred at a Royal Farm store located a short distance from the convenience store. The officers handling the Royal Farm burglary had developed a description of the suspects, who all wore dark colored hooded sweatshirts, and a suspect vehicle, described as a dark colored Honda with a very loud exhaust.  ECF No. 17, Ex. 2, Heyman Aff., pp. 1-3.

While in the area of the convenience store, Heyman saw a dark colored Honda with loud exhaust.  Heyman attempted to stop the vehicle, activating his emergency lights and siren.  The driver of the Honda accelerated and fled.  Heyman chased the Honda for a short distance and then terminated his chase but continued to track the vehicle at a distance.  Heyman observed the driver of the Honda as a light-skinned Hispanic or black male wearing a black skullcap.  Heyman lost sight of the vehicle but then discovered it drifting at the intersection of Hillendale and Clearwood Roads, where the driver and occupants had abandoned it and fled on foot.  *Id.*, Heyman Aff., pp. 4-6.

---

[3] The record designations in this memorandum reference the court's electronic docketing system.

Roesler and his K-9 partner Luke responded to the location of the abandoned Honda, where Heyman informed Roesler that the driver was a light-skinned black or Hispanic male wearing a skull-type cap.  Luke began to track a scent from the driver's side of the vehicle.  Luke located first one, then a second Timberland boot, and began pulling Roesler toward an open gate that led to the backyard of a nearby residence.

As Roesler and Luke approached the gate, Roesler heard someone yell. He shined his flashlight in the direction of the noise and saw Luke "holding a bite" on a light-skinned black male subsequently identified as Martinez.  Luke was holding Martinez by the upper arm as he was trained to do until commanded to release.  Roesler ordered Martinez to show his hands. Upon compliance, Roesler ordered Luke to release Martinez.  Luke immediately released the hold. Martinez was wearing a black hooded sweatshirt and a skull cap and was shoeless.  ECF No. 17, Ex. 4, Roesler Aff., pp. 6, 8-13, 16.

Additional officers, including Heyman, arrived to assist Roesler.  Heyman identified Martinez as the driver of the vehicle he had pursued, whereupon Martinez was arrested and transported to the Towson precinct, arriving there at 12:54 a.m.  ECF No. 17, Ex. 2, Heyman Aff., pp. 3, 9-10; Ex. 4, Roesler Aff., pp. 6-7.  At the precinct Martinez was questioned by Corporal James P. Rommel and Detectives Kimberly Montgomery and Rene Altiere.  ECF No. 17, Ex. 3, Rommel Affidavit, p.4; Ex. 2, Heyman Aff., p. 6.

Martinez was then taken to the Greater Baltimore Medical Center ("GBMC") for treatment of his bite.  ECF No. 17, Ex. 5, Affidavit, p. 7; Ex. 8.  Hospital records show he was being treated in the emergency room at 2:23 a.m. for puncture wounds to his right upper arm, for which he received stitches and was prescribed pain medication and antibiotics.  No head injuries

were reported.[4]  He was discharged from the hospital into police custody at 6:02 AM on June 30,

2011.  ECF No. 17, Ex. #9, pp. 2-12.

      Corporal James P. Rommel, who supervises the County's K-9 section, investigated

Martinez's apprehension by Luke, interviewing Martinez at the precinct prior to his transport to

GBMC.  Martinez was also questioned on July 20, 2011, by Corporal Reginald Cohen of the

Department's Internal Affairs Division.  Martinez stated he had been drinking at a bar but could

not remember the name of the bar.  He claimed he sat on a metal box in "that ladies yard" (sic),

fell asleep, and fell off the box, awakening when bitten by the dog.  ECF No. 17, Ex. 3, p. 5-6;

Ex. 9, pp. 5-19.

      Martinez was brought to trial in the Baltimore County Circuit Court on July 25, 2012,

before the Honorable Judge Michael J. Finifter. Martinez entered an *Alford*[5] plea to second-

degree burglary of the Oakleigh Convenience Store on June 30, 2011. Judge Finifter found that

Plaintiff Martinez "has freely, voluntarily, knowingly, intelligently entering into an Alford plea

to count five, which is second degree burglary. I find that he understands the nature of the charge

against him, the consequence of his plea, and I will accept it subject to a basis in fact being

established by the State."  ECF No. 17, Ex. 6, p. 18. Martinez was sentenced to five years of

incarceration. *Id.,* Ex. 6, p. 20.

### Standard of Review

      Rule 56(a) of the Federal Rules of Civil Procedure provides that the "court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

---

[4] Martinez's claim that Roesler kicked him in the head, causing a permanent bald spot (ECF No. 14, p. 2), is further refuted by Sgt. Zalewski, who examined Martinez's prior arrest records and found a booking photograph, dated April 29, 2011, depicting two bald spots of the left side of the head in the same location as the two bald spots apparent in the June 30, 2011, booking photographs.  ECF No. 17, Ex. 5, Zalewski Aff.; Ex. 12 and 13.

[5] The plea permits a criminal defendant to enter the equivalent of a guilty plea by admitting there is enough evidence to convict him at trial, but maintaining his innocence. *See North Carolina v. Alford*, 400 U.S. 25 (1970).

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme

Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its

very terms, this standard provides that the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club,*

*Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ.

P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant,

and draw all reasonable inferences in her favor without weighing the evidence or assessing the

witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir.

2002). At the same time, the court also must abide by the "affirmative obligation of the trial

judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*,

346 F.3d at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)) (internal

quotation marks omitted) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

Plaintiff's claims of excessive use of force incident to arrest and denial of prompt medical care

shall be examined in light of this standard of review.

## Analysis

The Fourth Amendment's prohibition on unreasonable seizures includes the right to be

free of "seizures effectuated by excessive force." *Schultz v. Braga*, 455 F.3d 470, 476 (4th

Cir. 2006). Claims of excessive force during an arrest are examined under the Fourth

Amendment's objective reasonableness standard.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989); *Scott v. Harris*, 550 U.S. 372, 381 (2007); *see also Kentucky v. King*, 131 S. Ct. 1849, 1859 (2011) ("Our [Fourth Amendment] cases have repeatedly rejected a subjective approach, asking only whether the circumstances, viewed objectively, justify the action.") (internal quotation marks and citations omitted).

Courts determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U.S. at 397.  This "requires balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (citation omitted).  Factors to be included in making this determination include the severity of the crime, whether there is an immediate threat to the safety of the officer or others, and whether the subject is resisting arrest or attempting to flee.  *See Graham*, 490 U.S. at 396. The determination is to be made "from the perspective of a reasonable officer on the scene." *Id.*

The Constitution does not require police to gamble with their lives, *see Elliot v. Leavitt*, 99 F.3d 640, 641 (4th Cir. 1996); thus, the right to make an arrest carries with it the right to use the amount of force that a reasonable officer would think necessary to take the person being arrested into custody.  *See Martin v. Gentile*, 849 F.2d 863, 869 (4th Cir. 1988).  In considering whether reasonable force was used, a court must focus not on an officer's intent or motivation, *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 361 (4th Cir. 2010), but rather on whether a hypothetical, reasonable officer would have thought his conduct was unlawful in the situation he encountered.  *See Clem v. Corbeau*, 284 F.3d 543, 552-53 (4th Cir. 2002) (citations omitted); *Elliott*, 99 F.3d at 643 (cited in *Henry v. Purnell*, 652 F.3d 524, 535 (4th Cir. 2011) (en banc)).

The Supreme Court has explained that a Fourth Amendment seizure requires "an intentional acquisition of physical control," which occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied.*"  *See Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (emphasis in original).  As noted in *Melgar*, which also involved the bite of a police dog, an officer need not seize an individual in the precise manner intended. Here, as in *Melgar*, Officer Roesler specifically used his dog to locate Martinez; as such, Martinez was seized "by the very instrumentality set in motion ... to achieve that result."  *Melgar*, 593 F.3d at 356 (citing *Brower*, 489 U.S. at 599).  As in *Melgar*, the fact that the seizure did not occur in quite the manner the officer had envisioned does not remove the incident from the examination under the Fourth Amendment, especially since Luke was trained to bite any individual he found when tracking.

Reasonableness is evaluated from the officer's perspective, and officers cannot be expected to respond to information they did not possess at the time they acted.  *See Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994), *cited in Melgar*, 593 F.3d at 355.  Roesler argues that his actions were objectively reasonable in light of a number of factors.  The driver and passengers of the vehicle believed to have been used in two burglaries had been pursued and had abandoned the vehicle and fled.  As a result, Roesler and other officers had to pursue the suspects on foot.  Luke picked up a scent from clothing found near the vehicle and while leashed led Roesler toward the back yard of a house and, specifically, toward a gate.  Luke, a K-9 trained to track suspects, was the first to enter through the gate and immediately placed a "bite hold" on Martinez, who was under some bushes just inside the gate and shoeless.  The dog promptly released Martinez when ordered to do so by Roesler.

Martinez stresses that he was not resisting arrest and did not provoke Luke.  He also states that

> at no time did . . . Roesler announce himself as a police officer and/or yell-out to the area where his dog was "alerted" that he was the police and demand . . . any suspect(s) to surrender.  Instead, when his dog "alerted," he simply just let him go to attack whatever and whomever.

ECF No. 21, p. 1.

The evidence does not show that Luke was released by Roesler; rather, the dog, which remained leashed, was in the lead tracking, was the first to enter the gate to the yard, and immediately discovered and placed a "bite hold" on Martinez, who clearly matched the description of a suspect in a burglary that had just occurred.  In *Kopf v. Wing*, 942 F.2d 265, 268 (4th Cir. 1991), and *Vathekan v. Prince George's County*, 154 F.3d 173, 176 (4th Cir. 1998), the appellate court found that failure to give a warning before *releasing* police dogs from their leashes by officers attempting to apprehend criminal suspects is objectively unreasonable in an excessive force context.  The facts of this case in no way mirror the facts of *Kopf* or *Vathekan* and provide no support for Martinez's argument that Roesler was required to call out a warning that Luke was tracking and about to enter a gated yard.  As noted in *Melgar*, 593 F.3d at 360, "[t]here is a vast difference between an officer releasing a dog off a leash knowing with a good degree of certainty that it will find and bite its target and an officer exercising substantial control over a leashed animal with the expectation of being able to prevent any injury."  The evidence in this case demonstrates that Roesler's conduct was reasonable and did not violate the Fourth Amendment.[6]

---

[6] Counsel argues that even if Roesler's conduct with regard to Luke's action is deemed a constitutional violation, the facts do not demonstrate that Roesler's conduct violated clearly established federal law, entitling him to qualified immunity under *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  Under *Harlow* and its progeny, officers will not be held liable, even if they violate statutory or constitutional rights, unless they had prior guidance that would allow

Martinez's claim of impermissible delay in providing medical care following his arrest fares no better.  The constitutional protections afforded a pretrial detainee as provided by the Fourteenth Amendment are co-extensive with those provided by the Eighth Amendment to the convicted prisoner.  *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992) (citing *Martin v. Gentile*, 849 F. 2d 863, 870 (4th Cir. 1988)); *see also Riley v. Dorton*, 115 F. 3d 1159, 1167 (4th Cir. 1997) (pretrial detainee's Fourteenth Amendment right is similar to prisoner's Eighth Amendment right, and both require more than *de minimis* injury).

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment, *Gregg v. Georgia*, 428 U.S. 153, 173 (1976), and "[s]crutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).   In order to state a constitutional claim for a denial of medical care, Martinez must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).   Deliberate indifference to a serious medical need requires proof that, objectively, the affected individual was suffering from a serious medical need and that, subjectively, his custodians were aware of the need for medical attention but failed to either provide it or ensure the needed care was available.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992).   Proof of an objectively serious medical condition, however, does not end the inquiry.

---

them to determine that their contemplated action was improper.  As discussed above, Roesler's use of Luke to track Martinez simply did not violate clearly established law.

The subjective component requires "subjective recklessness" in the face of the serious medical condition.  *See Farmer*, 511 U.S. at 839-40.  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."  *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997).  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment."  *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).  If the requisite subjective knowledge is established, the inflicter may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer*, 511 U.S. at 844.  Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time.  *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000).

Martinez clearly suffered a dog bite that required suturing, pain medication, and antibiotics.  While the bite was painful, he was not suffering severe blood loss, nor does the record reflect that he was rendered unconscious or otherwise incapacitated by the injury. Martinez was arrested at 12:36 a.m. on June 30, 2011, taken from the arrest location at 12:52 a.m., and arrived at the precinct at 12:54 a.m.  ECF No. 17, Ex. 2, Heyman Aff., pp. 6-10.  He was interviewed, booked, and photographed, then taken to GBMC, where he arrived at 2:20 a.m. *Id.,* Ex. 3, Rommel Aff.  Nothing in the medical record suggests the 1½ hour delay between the time of arrest and his arrival at GBMC significantly affected either the ability to treat or the outcome of his injury.  Martinez remained at GBMC until suturing was completed, medications provided, and his level of pain had subsided.  Nothing more is constitutionally required.[7]

---

[7] The court declines to examine the application of the qualified immunity doctrine with regard to Martinez's medical claim.

**Conclusion**

Martinez, the non-moving party, must establish the existence of a genuine issue of material fact by presenting evidence on which a fact-finder could reasonably find in his favor. Martinez has failed to submit any evidence to support his claims, or to put the material fact of his claims--the use of excessive force against him during arrest, and the denial of prompt medical care--in dispute.  *See generally Gray v. Spillman*, 925 F.2d 90 (4th Cir. 1991).  While the court may not determine credibility between the parties, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Martinez has presented no evidence to contradict defendants' affidavits and records or to demonstrate lasting injury as a result of the brief delay in providing medical treatment for the dog bite.  His claim that he was not fleeing the scene of a crime and was not hiding from police pursuit (and thus wrongfully subjected to a "bite hold" by a police dog) is belied by the uncontroverted affidavits, investigative reports, and the statement of facts presented at Martinez's trial.  Accordingly, a separate order granting defendants' dispositive motion follows.

DATED this 8th day of August, 2014.

BY THE COURT:

_____/s/_____

James K. Bredar
United States District Judge

11